## In re CIENA CORPORATION SECURITIES LITIGATION.

### No. Civ.A. JFM–98–2946.

United States District Court, D. Maryland.

May 15, 2000.

Marc A. Topaz, Schiffrin & Barroway, Bala Cynwyd, PA, Marc S. Zweben, Rockville, MD, Charles J. Piven, Baltimore, MD, John B. Isbister, Tydings & Rosenberg, Baltimore, MD, Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, PA, for plaintiffs.

Shirli Fabbri Weiss, Robert W. Brownlie, Mark H. Hamer, Gray, Cary, Ware & Friedenrich LLP, San Diego, CA, Joseph M. Hassett, Hogan & Hartson LLP, Washington, DC, Douglas R.M. Nazarian, Hogan & Hartson LLP, Baltimore, MD, for defendants.

## OPINION

MOTZ, District Judge.

This is an action for securities fraud brought against CIENA Corporation and several of its officers. Plaintiffs seek to represent a class composed of all persons (other than the officers and directors of CIENA and their privies) who were damaged by having purchased CIENA stock during the period from May 21, 1998, to September 14, 1998 ("class period"). Plaintiffs allege that during the class period, defendants made misleading public statements for the purpose of suppressing information about (1) the failure of CIENA's products under a testing agreement with AT & T, and (2) deteriorating prospects for future sales of CIENA's products to its existing major customers. The reason defendants allegedly made these misstatements was to enable a proposed merger between CIENA and another company, Tellabs, Inc., engaged in the telecommunication equipment business, to be consummated. Ultimately, the merger failed after the information defendants allegedly sought to suppress became publicly disclosed.

By a letter opinion dated July 19, 1999, I dismissed plaintiffs' consolidated amended complaint but granted them leave to file a second consolidated amended complaint ("SCAC"). After a hearing held on January 24, 2000, during which I determined that certain allegations in the SCAC required further clarification and specification, I granted plaintiffs leave to amend the SCAC by interlineation. Presently pending before me is defendants' motion to dismiss the SCAC as thus amended. The motion will be granted.

## I.

### A.

CIENA has been a publicly-traded company since February 1997. It designs, manufactures, and sells dense wavelength division multiplexing ("DWDM") systems for fiberoptic communication networks.[1] Its customer base consists of long-distance telecommunications companies. All of its revenues for the fiscal year ended October 31, 1996 were derived from Sprint Corporation, and 88% of its fiscal 1997 revenues were derived from Sprint and LDDS WorldCom ("WorldCom"). CIENA's largest potential customer was AT & T, and in June 1997, it announced it had signed a trial evaluation agreement calling for it to supply AT & T with six 16-channel DWDM systems for laboratory interoperability testing.

CIENA's systems did not test well in AT & T's laboratories. Under the terms of the agreement AT & T could terminate testing if seven or more "severity 1" problems occurred in any given quarter. By December 1997 enough problems, including several circuit board fires, had developed to trigger AT & T's termination rights. The testing problems continued into 1998. CIENA's future as a supplier to AT & T was further clouded by the fact that early in 1998 Lucent Technology

Corp. announced that it had developed an 80–channel ultra-dense wavelength system which it was planning to deploy in the fourth quarter of 1998.

Simultaneously, CIENA was encountering difficulties in its relations with Sprint and WorldCom. In March 1998 Sprint advised CIENA that its future purchases would be greatly decreased because it had DWDM systems deployed in 70% of its network by the end of 1997 and would have DWDM systems deployed in 95% of its network by August 1998. Likewise, in February 1998 WorldCom advised CIENA of a change in its deployment policy that would result in a substantial reduction of its purchase of equipment from CIENA during CIENA's 1998 fiscal year ending October 31, 1998. Furthermore, CIENA was aware of merger negotiations between WorldCom and MCI, and it allegedly knew that if the merger were effected, WorldCom's purchases from CIENA would be substantially decreased since MCI used a wavelength planning system incorporating equipment less expensive than that supplied by CIENA.

### B.

In March 1998 CIENA began merger discussions with Tellabs, a firm that designs, manufactures, markets, and services voice and data transport and network access systems. Tellabs has been in business over twenty years and had strong relationships with many of the regional Bell operating companies and with interexchange and local exchange carriers. However, it recognized the need to develop DWDM technology and had been unsuccessful in developing such technology on its own. The merger thus represented a potential marriage between Tellabs' strong customer base and CIENA's DWDM expertise. A deal was eventually struck under which there would be a "merger of

---

1. I have attempted to recite the pertinent facts in Sections I and II of this opinion in a manner coinciding with plaintiffs' theory of liability so that their view of the case can be properly understood. Therefore, I have omitted reference to several disclosures made by CIENA that I believe are inconsistent with plaintiffs' claims.

equals," i.e., one share of CIENA common stock would be exchanged for one share of Tellabs common stock.

The proposed merger was announced on June 3, 1998. The shareholders of the two companies were originally scheduled to vote on it on August 21, 1998. Events intervened. On June 1st, two days before the announcement of the proposed merger, another CIENA circuit board caught fire in AT & T's beta testing facility.[2] Plaintiffs allege that on an unspecified date, but "within days of the fire," AT & T "permanently terminated its testing of CIENA's 16–channel DWDM products." No public disclosure of this fact was immediately made. Instead, as outlined in Section II, *infra*, plaintiffs allege that during the next two and a half months, CIENA and its chief executive officer, Patrick Nettles, made a series of public statements that were false and misleading.

On August 13, 1998, CIENA publicly disclosed that it anticipated disappointing third quarter results (earnings of less than half what many analysts had been predicting). That announcement adversely impacted upon the market value of CIENA's common stock. On August 21st CIENA made another announcement—that it had been informed by AT & T that AT & T would not pursue further evaluation of any of CIENA's DWDM systems. On August 21st CIENA also announced it was postponing its shareholders' meeting scheduled that day to vote on the proposed merger. As a result of those announcements, the price of CIENA's common stock plunged by more than 45% when trading was resumed after the announcement was made. The stock closed that day at $31.25 per share—a decline of almost 60% from the class period high of $88.625 recorded on July 20, 1998, one month earlier.

The steep decline in the price of CIENA's stock caused the merger terms to be renegotiated. Under the new agreement all outstanding CIENA stock would be exchanged at a ratio of 0.8 shares of Tellabs stock for each share of CIENA stock. CIENA and Tellabs announced the terms of the renegotiated agreement on August 28, 1998. The merger vote was scheduled to be held on September 14, 1998.

Again, events intervened. On September 9, 1998, Pirelli, one of CIENA's competitors, issued a news release stating it had been awarded a $240 million contract from Digital Teleport, Inc. ("DTI") to supply 80% of DTI's wavelength division multiplexing systems. According to plaintiffs, based upon previous announcements made by CIENA, the market had believed the DTI contract would be awarded to CIENA. On the day Pirelli's announcement was made, the market price of CIENA stock dropped by 17%.

On September 14, 1998, CIENA announced that the proposed merger with Tellabs was terminated. It also announced that its fourth quarter results were expected to be "materially below" its third quarter results. Again, the price of CIENA stock declined. It closed on September 14th at $8.1875 per share. This represented more than a 90% decline from the high of $88.625 reached on July 20th.

## II.

As indicated above, plaintiffs seek to represent a class composed of all persons (other than the officers and directors of CIENA and their privies) who were damaged by having purchased CIENA stock during the period from May 21, 1998, to September 14, 1998. May 21st is identified as the starting date because on that day CIENA issued a press release announcing the results of its 1998 second quarter ended on May 2, 1998. September 14th is the day on which the CIENA/Tellabs merger was terminated.

---

**2.** According to a *Washington Post* article cited by plaintiffs in the SCAC, the fire occurred around midnight on June 1st.

Plaintiffs' claims are based upon alleged misstatements made by CIENA, through Nettles or in public filings, on seven separate occasions: (1) in the May 21, 1998 press release; (2) during a conference call Nettles held with securities analysts on May 21, 1998; (3) in an interview with Nettles published in *Upside* magazine on June 1, 1998; (4) during a telephone conference with securities analysts on June 3, 1998, discussing the proposed merger between CIENA and Tellabs announced that day; (5) in an S–4 registration statement jointly issued by CIENA and Tellabs to their shareholders on July 21, 1998; (6) in a press release issued by CIENA on August 14, 1998, concerning the company's expected third quarter results; and (7) during a telephone conference Nettles and Joseph Chinnici, CIENA's chief financial officer, held with securities analysts on August 14th.[3] The alleged misstatements fall into three major categories: those relating to the AT & T relationship; those relating to Sprint and WorldCom; and those relating to DTI. I will briefly describe them.

### Statements About the AT & T Relationship

In the May 21, 1998 telephone conference, Nettles stated in response to an analyst's question: "We have orders from AT & T, for limited systems. Those orders will not result in immediate revenue and we won't be delivering a large amount of product, but yes we do have orders." This statement is alleged to be untrue because

it implies that CIENA had received product orders from AT & T when, in fact, the only orders CIENA received from AT & T were for equipment being tested under the June 1997 agreement.

Nettles also stated during the May 21st conference call that CIENA had "developed a good solid working relationship with the management and the working troops" at AT & T. Plaintiffs allege this statement was misleading because CIENA's equipment was not passing AT & T's testing and, in fact, AT & T had been entitled since December 1997 to terminate the testing.

On June 3, 1998, Nettles held a telephone conference announcing the proposed merger with Tellabs. During the course of the conference Nettles made reference to CIENA's "position as a selected supplier for AT & T." Plaintiffs allege that CIENA held no such position.

On July 21, 1998, CIENA and Tellabs issued an S–4 registration statement in connection with the proposed merger. The S–4 disclosed that AT & T had advised CIENA it had decided that actual deployment of CIENA's 16–channel system would be inadvisable. Plaintiffs allege, however, that the S–4 was misleading in that it failed to disclose that CIENA's 16–channel system had failed AT & T's testing and falsely suggested the reason for AT & T's decision was that AT & T was switching to an accelerated evaluation of commercially available DWDM systems, including CIENA's 40–channel system.[4]

---

**3.** The only misstatement allegedly made by Chinnici concerned a gross margin projection for the fourth quarter. It was clearly a "forward-looking statement" within the meaning of the Private Securities Law Reform Act. *See* 15 U.S.C. § 78u–5(c).

**4.** The pertinent portion of the S–4 read in full as follows:

AT & T has recently indicated to CIENA that the capacity requirements of its network have grown to such an extent that the delays in final certification and approval for deployment of CIENA's customized 16–channel system would make actual deployment of that system inadvisable, and that

AT & T would accordingly be shifting to an accelerated evaluation of commercially available, higher channel count systems. CIENA believes AT & T will evaluate CIENA's MultiWave 4000 system positively in this context, particularly because CIENA believes it is the only manufacturer in the world with operational 40 channel systems ready for prompt delivery on an "off-the-shelf" basis in substantial manufacturing volumes. However, the outcome of the evaluation process with AT & T cannot be predicted, particularly given the protracted experience CIENA has had with AT & T's

On August 14, 1998, the day after CIE-NA issued a press release announcing it expected disappointing third quarter earnings, Nettles held a conference call with analysts. In discussing the AT & T relationship, he said:

At AT & T we have been going through a period of testing up until, I believe it was mid-July, give or take, of our 16-channel system with custom software that was specifically tailored to AT & T's requirements. We started a conversation around the time of Supercomm [trade show in June 1998] with AT & T about higher channel capacity systems. Clearly, they have expressed an interest in that and we wanted to pursue that with them. As a result of that plus the reduction in force that occurred at AT & T about that time, they came to the conclusion that to continue the process of certifying a 16-channel system from two suppliers was probably not going to make sense given the fact that their requirements seemed to be going well beyond 16-channel capacity in the near term.

So they agreed to shift their focus to higher channel count systems and, more importantly, from our point of view, to look at commercially available product rather than product that is specifically targeted toward their requirements.

We have, as far as I know, the only higher-channel count system in the marketplace that is being shipped today, and being shipped in volume. We also are able to respond to many of the requirements they'd like to have by the software development work that we have done to date on the 16-channel system that can be imported directly to the higher channel count systems. So, we think we are in a great position for that.

They have looked at other suppliers and I think that is prudent on their part, just so they know what the market is. But, we're comfortable as they look at other

suppliers, that they won't see something that is more desirable.

Frankly, I feel pretty good about our position with them given the two years we've spent in understanding their requirements and their way of doing business and the development stage of our products and the manufacturing stage of our products.

Plaintiffs allege these remarks were misleading for the same reasons that the S-4 filed on July 21st was misleading.

*Statements About Sprint and WorldCom*

During the May 21st conference call Nettles opined that the present demand for CIENA's products was "strong and growing" and that CIENA was "excited" about the level of activity from the company's new accounts as well as from "traditional customers." He further stated that CIENA and Sprint had a "strong continuing relationship." Plaintiffs allege these statements were false and misleading because CIENA was aware that the product orders CIENA would be receiving from Sprint and WorldCom in the foreseeable future would be substantially less than they had been in the past.

For the same reason plaintiffs complain about other statements made during the class period. In an interview published in *Upside* magazine on or about June 1, 1998, Nettles is quoted as saying that CIENA was WorldCom's "supplier of choice." He further said that WorldCom's previously announced reduction in orders was "one of the little bumps in the road that does not affect our plan substantially" and is not "a big factor to be concerned about." In the S-4 filed on July 21, 1998, CIENA said that its relationship with Sprint was "very strong," and that WorldCom was "very satisfied" with CIENA's products and intended to continue significant purchases.

During the telephone conference held with analysts on August 14, 1998, in the wake of CIENA's announcement the previ-

evaluation of the 16-channel MultiWave       Sentry.

ous day that it anticipated disappointing third quarter earnings, Nettles stated: "While we are disappointed in the outcome, I want to emphasize that we do not believe this signals any fundamental change in the strength of the business or in the market we serve.... Our customer base is growing.... We see indications of renewed activity at WorldCom.... While we are disappointed with the Q3 results, our business is sound, our market is sound." Plaintiffs allege that these predictions, as well as several projections made during the class period about CIENA's future revenues and earnings which necessarily were dependent on substantial purchases by Sprint and WorldCom, were inaccurate and misleading.

### Statements About DTI

During the August 14th conference call, Nettles also referred to the

> delay of a large order which was greater than $25 million that was expected near the end of the quarter from an existing customer.... We believe this is just a timing issue and we should show revenue from that business in our fiscal Q4 if we were to continue independent reporting.

Although Nettles did not refer to the customer by name, plaintiffs allege that he was referring to DTI and that the market so understood. CIENA never received the $25 million order. DTI switched to Pirelli as its supplier of DWDM systems, and it was Pirelli's announcement of that fact on September 9, 1998, that was the last straw causing the collapse of the proposed CIENA/Tellabs merger.

Plaintiffs allege that when Nettles made his statements on August 14, 1998, he knew that DTI had decided not to award the $25 million contract to CIENA. They base their allegations upon two facts. First, on the same day that Nettles made his statements, DTI made a filing with the SEC stating, *inter alia*, that it was "dependent on a Pirelli affiliate and to a lesser extent, Ciena Corporation, for DWDM equipment." Plaintiffs infer from this

statement that by August 14th, DTI had advised CIENA that it would not be awarding the $25 million contract to CIENA. Second, plaintiffs assert that the merger price renegotiated between CIENA and Tellabs on August 21, 1998, did not factor in revenue from the DTI contract, giving rise to an inference that CIENA had been previously advised that it would not be awarded the contract.

### III.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires plaintiffs, for each alleged misrepresentation or omission, to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In this case plaintiffs must show that defendants acted with scienter, i.e., they "acted intentionally, which may perhaps be shown by recklessness." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 620 (4th Cir.1999). The PSLRA did not change this substantive standard. It did, however, raise the standard for pleading scienter. *See id.*

Exactly how high that standard has been raised is not clear. In *Phillips* the Fourth Circuit succinctly described the conclusions that various courts have reached on the question. *See id.* at 620–21. No useful purpose would be served by my repeating what the Fourth Circuit has stated. I will only say (as I indicated in my letter opinion of July 19, 1999) that it seems to me rather clear from the Conference Committee Report, the President's veto message, and the override of the President's veto that Congress intended to tighten the Second Circuit's pleading standard for scienter. At the same time I believe it would be unreasonable to read too much into this legislative history. In my view, all that should be inferred is that courts should scrutinize scienter allegations critically, requiring particularity and plausibility, instead of mechanically apply-

ing any test, the Second Circuit's or anyone else's.

In any event, like the Fourth Circuit in *Phillips*, I need not articulate a precise pleading standard in this case. Under the Second Circuit test, which is the most liberal one possible under the PSLRA, "a plaintiff may plead scienter by alleging specific facts that either (1) constitute circumstantial evidence of conscious or reckless behavior or (2) establish a motive to commit fraud and an opportunity to do so." *Id.* at 620 (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir. 1993)). Plaintiffs have met neither prong of this test.

## IV.

■ Mere negligence, of course, is not sufficient to prove scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).[5] A plaintiff must prove that the defendant acted with a conscious or reckless effort to defraud. Recklessness requires an act "so highly unreasonable and such an extreme departure from the standards of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir.1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)). If the complaint "fails adequately to allege that defendants' statements were [materially] false (affirmatively or through omissions), the [c]omplaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 813 (2d Cir.1996).

Here, plaintiffs have not made the threshold showing of material falsity. Un-

questionably, a series of untoward events occurred for CIENA during the first nine months of 1998, both before and after the start of the class period. Undoubtedly, in his public statements Nettles interpreted those events as favorably as he could, maintaining an optimistic outlook in potentially difficult times. However, that is a mark of leadership, and the market should expect no less. Nettles and CIENA properly disclosed the external factors that could adversely affect the company's performance and, when viewed in context in which they were made, *see, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir.1994); *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir.1994); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), they were not materially false or misleading.

## A.

■ Plaintiffs alleged in the original consolidated amended complaint that defendants knew that the board fire occurring on June 1, 1998, "marked the end of CIENA's AT & T relationship." ¶ 114.a. In my letter ruling granting defendants' motion to dismiss, I gave plaintiffs the following instruction in filing their second amended complaint:

> If any allegation is based not upon a source who has provided specific facts supporting it but upon an inference that plaintiffs believe is reasonable from other facts known to them, plaintiffs must forthrightly so state in the SCAC so that the issue of the adequacy of the inference can be joined by a Rule 12(b)(6) motion. Again using as an example the allegation that CIENA knew in early June that its relationship with AT & T was being terminated, if that allegation is based solely upon the nature of the test failures of CIENA's equipment, the SCAC should so state.

---

5. Since the Fourth Circuit has so recently spoken on the issues in *Phillips,* in this paragraph I am paraphrasing what it said and quoting from the same authorities it quoted. *See Phillips,* 190 F.3d at 620.

When the SCAC was filed (and again amended pursuant to my January 24, 2000 ruling), plaintiffs' allegation that CIENA knew that the June 1st board fire marked the end of its relationship with AT & T was dropped. Instead, plaintiffs alleged that "within days of the fire" AT & T advised CIENA that it had "permanently terminated its testing of CIENA's 16–channel DWDM products," not that AT & T advised CIENA that it had terminated their relationship.

This distinction is critical. If, in fact, CIENA knew within days of the June 1st incident that its relationship with AT & T had been terminated, its failure to disclose that fact may well have been material. It would have rendered false the suggestion made by CIENA in its S–4, filed on July 21, 1998, and reiterated by Nettles in his August 14th conference call, that AT & T might positively evaluate CIENA's 40–channel system. However, the mere fact that AT & T had stopped its testing of CIENA's 16–channel system—a fact which CIENA disclosed in its S–4—did not foreclose the possibility that it would evaluate another CIENA system. In that regard one of the very facts emphasized by plaintiffs—that there had been persistent difficulties, including other fires, throughout the testing of the 16–channel system—undercuts their position. Despite these difficulties, AT & T did not exercise its termination rights that had been triggered as early as December 1998 under the testing agreement. This willingness to go forward demonstrated AT & T's toleration of testing failures in the research and development process.

Moreover, in the August 14th conference call, Nettles specifically identified the time and place, a trade show held in June 1998, where CIENA began a conversation with AT & T about higher channel capacity systems. Plaintiffs have made no allegations, particularized or otherwise, to suggest that Nettles was not telling the truth about this. Similarly, although plaintiffs allege that CIENA and Nettles falsely stated that AT & T had decided to focus its attention upon higher channel systems, they have made no allegations to demonstrate that this was not true.[6]

Plaintiffs' other allegations concerning CIENA's disclosures and non-disclosures about the AT & T relationship are equally infirm. Plaintiffs assert that in his telephone conference with analysts on June 3, 1998, following the public announcement of the proposed merger between CIENA and Tellabs, Nettles falsely stated that CIENA was a "selected supplier" for AT & T. Nettles' full statement on the subject was as follows:

I would have to say that at the moment the approach with AT & T is very specific to the product specifications that they have promulgated more than almost two years ago. It has been a long path. I don't know that there's any immediate or quick solution or quick fix out of this. We don't foresee that. We think that the problems and the opportunities there are the problems and opportunities we've been addressing. We have worked [sic] to do. We think that having scale over time will be very important in dealing with the broader range of product opportunities there. Our position as a selected supplier for AT & T is one that I think we can build on, but the building process is not measured in days or months, but over the next several years.

---

6. In asserting that defendants were under a duty to disclose the June 1st board fire and AT & T's cessation of testing of CIENA's 16–channel system, plaintiffs seem to operate from the premise that AT & T's decision to evaluate higher channel systems was due to the testing failure. It may well be that the converse is true, i.e., that AT & T's growing interest in higher channel systems explains why it was unwilling to accept the June 1st testing failure as it did the failures that had earlier occurred. Other allegations made by plaintiffs—such as CIENA's declining competitive position in light of Lucent Technology's announcement in early January 1998 that it had developed an 80–channel system—reflect that higher channel systems were thought to be the wave of the future.

In making the statement, Nettles was responding to a question about CIENA's effort "to get qualified at AT & T." Therefore, self-evidently he was not saying anything more than what was already known: that CIENA had been selected to have its 16–channel system evaluated by AT & T. This conclusion is reinforced by the very sentence in which Nettles used the phrase "selected supplier." He indicated that the status was one he thought CIENA "could build on" but he recognized that "the building process is not measured in days or months, but over the next several years."

Indeed, what is most important about Nettles' statement is that it demonstrates he was truthful in his public disclosures about the difficulties CIENA confronted. While seeing "opportunities" in the AT & T relationship, he also acknowledged that the relationship had "problems" and that "it has been a long path." Any reasonable analyst or investor could not properly infer from what Nettles said that it was likely CIENA would be reaping benefits from AT & T's testing of its 16–channel product in the foreseeable future. Perhaps recognizing this fact, plaintiffs have attempted to impute Nettles' honesty by implying he knew on June 3rd that AT & T had terminated testing the 16–channel project because of the board fire two days earlier. Plaintiffs have not, however, made factual allegations to support that implication. As I have previously indicated, the most they have been able to do is to allege. (after having been given two bites at the apple) that "within days of the fire, AT & T permanently terminated its testing of CIENA's 16–channel DWDM products and so advised CIENA of that termination and that it would not place any orders for CIENA's 16–channel products." The phrase "within days" does not establish Nettles' knowledge as of June 3rd, particularly since the fire apparently occurred around midnight on June 1st. In any event, Nettles made it clear on June 3rd that the relationship between CIENA and AT & T was not rosy, and the next time

CIENA addressed the market (July 21st), it explicitly stated that AT & T was not going to deploy its 16–channel system.

Plaintiffs' other allegations pertaining to the AT & T relationship are based upon two statements made by Nettles in his conference call on May 21, 1998 (the first day of the class period), following CIENA's announcement of it second quarter results. The first statement was that CIENA had "developed a good solid working relationship with the management and working troops" at AT & T. The second was that CIENA had "orders" from AT & T. Plaintiffs contend that the first of these statements was misleading because there had been failures of CIENA's channel–16 system throughout the testing period, and that the second statement was untrue because CIENA had not received any "product orders" from AT & T. These contentions are without basis.

Plaintiffs have alleged no particularized facts demonstrating that CIENA had not "developed a good solid working relationship" with AT & T, and the absence of such a relationship cannot be inferred from testing failures. To the contrary, the continuation of a working relationship between CIENA and AT & T in the face of testing failures would seem to imply that the relationship was "good [and] solid."

As to the second contention, it is plaintiffs themselves who have added the word "product" before the word "orders." Nettles never did. All that he said was that "we have orders from AT & T for limited systems. Those orders will not result in immediate revenue and we won't be delivering a large amount of product. But yes we do have orders." In fact, CIENA did have orders under the testing agreement with AT & T. Nettles implied nothing more, particularly since earlier in the May 21st conference call he had stated that the AT & T effort was "progressing more slowly than hoped" and that "we recognize that there's some things we could have done better."

## B.

■ On May 21, 1998, the first day of the class period, CIENA filed its Form 10–Q for its second quarter. The 10–Q disclosed:

WorldCom informed the Company in February 1998 that its DWDM system requirements for 1998 will be substantially reduced, based on a change in WorldCom's capital equipment acquisition policies.... Consistent with WorldCom's announced change in purchasing practices, WorldCom's purchases in the Company's second quarter were not material.

The 10–Q also disclosed that "Sprint is unlikely to continue purchasing at the rate experienced in the quarter just completed."

In a press release also issued on May 21st, CIENA stated: "We face continued uncertainty surrounding the volume and timing of the resumption of ordering from WorldCom." The S–4 filed on July 21, 1998, incorporated by reference the May 21st Form 10–Q. The S–4 also disclosed that "During the first quarter of 1998, WorldCom informed CIENA that a change in its deployment policy would result in substantial reduction and system requirements from CIENA during fiscal 1998 compared to fiscal 1997."

It is against the background of these disclosures that plaintiffs' allegations, described in Section II, *supra*, that CIENA made material misstatements about Sprint and WorldCom must be considered. CIENA did publicly disclose expected reductions in purchase orders from the two companies. That such reductions occurred did not mean that CIENA and Sprint did not have a "strong continuing relationship," (as Nettles stated during his May 21, 1998 conference call with analysts), that CIENA was not WorldCom's "supplier of choice,"

(as Nettles was quoted as saying in the interview published in *Upside* magazine on or about June 1, 1998),[7] that CIENA's relationship with Sprint was not "very strong," or that WorldCom was not "very satisfied" with CIENA's products (as stated in the S–4 filed on July 21, 1998).

■ The other statements cited by plaintiff involved predictions made by CIENA of its future revenue and earnings, based, in part on predictions of Sprint's and WorldCom's purchasing patterns and timing. As such, they were "forward-looking statements" within the meaning of the PSLRA, 15 U.S.C. § 78u–5(i)(1), and are protected by the Act's safe harbor provisions. *See* 15 U.S.C. § 78u–5(c). The cautionary statements provided by CIENA in its Form 10–Q filed on May 21st were clear and "meaningful." They expressly warned of CIENA's historic and near-term dependence upon Sprint and WorldCom. Likewise, the press release issued that day cautioned "the Company's actual results could differ materially from those stated or implied" by "[f]orward-looking statements in this release including ... optimism about achieving moderately sequentially higher revenue and net income for the quarter and consensus revenue expectations for fiscal 1998." The release also referred to the risk factors contained in the 10–Q. The July 21st S–4 also contained a full description of risk factors, and cautions were given about forward-looking statements at the beginning of all of the telephone conferences in which Nettles participated. Finally, the cautionary statements aside, plaintiffs have not alleged any particularized facts showing that defendants had actual knowledge that any of the forward-looking statements were false or misleading—the substantive standard they must meet to blow the state-

---

7. Although the interview was published under a date of June 1, 1998, it is clear from certain statements made by Nettles during the course of the interview that it was actually conducted during CIENA's second quarter that ended on

May 2nd. Therefore, to the extent that any of plaintiffs' allegations are based upon a disconnect between what Nettles said and what he purportedly had learned on or about June 1st, their timing is off.

ments out of the safe harbor. *See* 15 U.S.C. § 78u–5(c)(1)(B).

### C.

■ Plaintiff's claim that Nettles' statement during the August 14, 1998, conference concerning his belief that a $25 million order expected but not placed in the third quarter would be placed in the fourth quarter was knowingly false when made. According to plaintiffs, Nettles then knew that DTI, the customer involved, had already advised CIENA that it would be switching its DWDM business to Pirelli, one of CIENA's competitors.

■ Plaintiffs have no source with personal knowledge to support this allegation. Rather, they infer that Nettles had such knowledge from the facts that (1) on the very same day DTI made a filing with the SEC stating its dependence on "a Pirelli affiliate and to a lesser extent, CIENA Corporation, for DWDM equipment," and (2) the exclusion of any factor for the $25 million in the merger price renegotiated between CIENA and Tellabs a week later. The allegations are insufficient to support plaintiffs' inference. The fact that DTI made an SEC filing which perhaps should have alerted CIENA (as well as the market) to the fact that DTI was switching suppliers of DWDM equipment does not mean that DTI directly advised CIENA of that fact. Similarly, assuming that an inference can be drawn that on August 21st CIENA and Tellabs were anticipating that the DTI contract might not be forthcoming,[8] that inference does not establish that CIENA had such knowledge seven days earlier.

### V.

Having concluded that plaintiffs have not alleged specific facts constituting cir-

cumstantial evidence of conscious or reckless behavior, I must now decide whether their allegations of motive and opportunity are sufficient to "giv[e] rise to a strong inference" that defendants made material misstatements intentionally or recklessly.

### A.

■ There are two aspects of plaintiffs' motive allegations. The first is rather banal: that the individual defendants, all of whom owned CIENA stock, wanted to inflate the value of their stock by announcing the Tellabs merger and selling a portion of their holdings prior to the merger at an artificially high price. Second, as I have previously described, plaintiffs assert that defendants wanted to withhold from the public adverse information about CIENA until the merger was consummated. Plaintiffs aver that defendants perceived the merger to be in their personal interest because the value of the stock of the merged entity would exceed the value of the stock of CIENA as a stand-alone company.[9]

Sometimes theory must succumb to facts. That is true as to plaintiffs' first theory of motive. With one exception involving a single forward-looking statement made by Joseph Chinnici, CIENA's chief financial officer, the only individual defendant who personally is alleged to have made any misrepresentations is Patrick Nettles. Nettles did not sell a single share of his stock during the class period. Thus, his motive could not have been to inflate the value of CIENA's stock by announcing the Tellabs merger in order for him to sell portions of his stock prior to the merger. His actions (or, more accurately, his inaction) prove the contrary.

---

**8.** Defendants argue that all that can be inferred from the fact that the DTI contract was not factored into the renegotiated merger price is that, given the adverse developments leading to the renegotiation, Tellabs would not credit CIENA for any sales that had not been actually booked.

**9.** One of the specific allegations made by plaintiffs is that defendants wanted the merger to occur in order to prevent CIENA from ever having to publicly announce its third-quarter and fourth-quarter results.

Other individual defendants did sell some of their stock during the class period. That fact alone, however, is not sufficient to give rise to an inference of fraudulent intent. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir.1999). The highest percentage of stock sold by any individual defendant was 27.7%, and as a group the individual defendants other than Nettles sold only 6% of their stock.[10] Particularly in light of the fact that none of these defendants (other than Chinnici who sold only 2.21% of his stock) are. alleged to have personally made any misrepresentations, these trades simply are not "suspicious" as was required even prior to the adoption of the PSLRA to give rise to an inference of fraud. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995). Indeed, the fact that the individual defendants sold so little stock could be construed as negating the inference that there was fraud. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir.1994); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989).[11]

### B.

■ Plaintiffs' second theory of motive is, in the abstract, more plausible. It is not unreasonable to infer that if Nettles believed the merger with Tellabs to be in CIENA's interest, he had a motive not to publicly disclose information that might obstruct the merger. The fact that Nettles was not acting out of personal greed (as demonstrated by his non-sale of his own stock during the class period) is irrelevant under this theory since, even if Nettles was acting out of a sense of duty to the corporation, his reason to dissimulate would be equally strong. Under the securities laws, purity of intent cannot alone excuse deceptive conduct.

Nettles' motive, however, must be analyzed together with the second prong of the motive/opportunity test. When so analyzed, plaintiffs' theory loses its plausibility. Under plaintiffs' view of events, CIENA and Nettles had to believe that for more than two and a half months (from June 3, 1998, when the proposed merger was publicly announced, to August 21, 1998, the originally scheduled date for shareholders' votes on the merger), they would be able to conceal adverse information about CIENA's relationship with Sprint, WorldCom, and AT & T even though (1) they did not have exclusive control over that information, and (2) they had reason to believe Tellabs would conduct a full due diligence investigation prior to the merger.

**10.** Specifically, the number of shares sold by each individual defendant and the percent of the shares sold to the defendant's holdings were as follows:

| DEFENDANT | SHARES SOLD | HOLDINGS | PERCENT SOLD |
| --- | --- | --- | --- |
| Patrick Nettles | 0 | 3,927,135 | 0.00% |
| Steve Chaddick | 60,000 | 1,060,250 | 5.66% |
| Lawrence Huang | 60,000 | 1,061,250 | 5.65% |
| Joseph Chinnici | 6,000 | 271,750 | 2.21% |
| Stephen Alexander | 30,000 | 411,750 | 7.29% |
| Mark Cummings | 7,500 | 210,000 | 3.57% |
| Andrew Petrik | 25,000 | 90,250 | 27.70% |
| Rebecca Seidman | 10,000 | 135,000 | 7.41% |
| Eric Georgatos | 5,000 | 165,000 | 3.03% |

**11.** Because I find that the sales of stock made by the non-speaking defendants are insufficient to give rise to an inference of fraud, I need not decide whether alleged misstatements may be imputed to them under the "group pleading" doctrine. I note, however, that application of that doctrine to non-speaking defendants would seem to be inconsistent with the strict pleading requirements of the PSLRA. *See Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 916 (N.D.Tex.1998); *see also In re Cryomedical Sciences, Inc. Sec. Litig.*, 884 F.Supp. 1001, 1012 (D.Md.1995); *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953, 961 n. 7 (D.Md. 1995).

As discussed above, CIENA had already publicly disclosed it was facing the possibility of substantially decreased orders from both Sprint and WorldCom. It would have been irresponsible for Tellabs not to make further inquiry into CIENA's relationship with these two companies as part of its due diligence, and it cannot be reasonably assumed that defendants anticipated that Tellabs would not do so. Likewise, given the importance the market had attached to CIENA's testing agreement with AT & T in June 1997 (when the agreement was first publicly announced), defendants equally had to anticipate that Tellabs would thoroughly explore the performance of CIENA's systems under the agreement and the probability of a long-term contract between CIENA and AT & T.

Plaintiffs respond that defendants were not concerned about Tellabs' due diligence investigation because Michael Birck, the chief executive officer of Tellabs, had indicated that Tellabs' was interested in CIENA because of the latter's technology, not its customer base.[12] The contention does not withstand the test of common sense. Birck and other Tellabs officers and directors had a fiduciary duty to the company's shareholders to conduct a full and complete due diligence investigation of all aspects of CIENA's operations. Lawyers and accountants hired by Tellabs would have committed professional malpractice if they advised and conducted anything less than complete due diligence. The mere fact that Tellabs was interested in CIENA's research and development capabilities did not make CIENA's financials irrelevant. If nothing else, CIENA's capacity to generate revenues and earnings impacted upon the value to be placed on its stock in the merger. The truth of that proposition is proven by the subsequent renegotiation of the merger price after the announcement that AT & T no longer would be looking at CIENA's 40–channel system.[13]

In summary, plaintiffs have failed to allege specific facts to meet their substantive burden that defendants acted with scienter. Accordingly, defendants' motion to dismiss will be granted. A separate order to that effect is being entered herewith.

### ORDER

For the reasons stated in the accompanying opinion, it is, this 15th day of May

ORDERED

1. Defendants' motion to dismiss the second amended complaint is granted; and

2. This action is dismissed.

---

12. Plaintiffs also suggest that defendants believed that they would not have to disclose information about the AT & T relationship because there was a confidentiality provision in the agreement between CIENA and AT & T. Assuming that defendants may have thought that the confidentiality provision might limit what AT & T would publicly disclose, they had no reason to believe that they could use it as a barrier to answering questions asked by Tellabs as part of its due diligence.

13. It should also be noted that it was CIENA itself that publicly disclosed the termination of· the AT & T relationship on August 21, 1998, just before the proposed merger was to be voted upon by CIENA and Tellabs shareholders. Recognizing that this disclosure is inconsistent with their theory, plaintiffs allege that CIENA was forced to make the disclosure by Birck. However, they have not alleged specific facts supporting that conclusory averment. They refer to an article appearing in the *Washington Post* on September 7, 1998 in which Birck is quoted as saying that it was only forty minutes before Tellabs' scheduled shareholder meeting on August 21st that Nettles called him to advise him that AT & T was no longer interested in testing CIENA's 40–channel system. Birck went on to say that he immediately phoned his lawyers who told him (as he knew they would) that he had to cancel the stockholders' meeting. There is simply nothing in this article to support the allegation that it was Birck who forced Nettles to make the public disclosure about AT & T's decision. All that it demonstrates is that Birck, like Nettles himself, knew the decision was a matter that had to be disclosed.